UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ROBERTO RIOS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-08-21 |
| | § | |
| CELANESE CORPORATION, | § | |
| | § | |
| Defendant. | § | |

## ORDER

On this day came on to be considered the motion for summary judgment of Defendant Celanese Corporation (hereinafter, "Celanese") in the above-styled action (D.E. 30, 31). Specifically, Celanese seeks summary judgment on Plaintiff's claims in this case, and Celanese asks the Court to limit Plaintiff's claims for back pay and to dismiss Plaintiff's claim for emotional distress damages.  For the reasons set forth below, Defendant Celanese's motion for summary judgment is hereby DENIED.

## I.      Jurisdiction

The Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331, because Plaintiff makes a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (hereinafter, "Title VII").

## II.     Factual Background

The following facts are not in dispute:    From November 5, 1990 through the date of his discharge on December 14, 2005, Plaintiff Roberto L. Rios worked at the Bishop, Texas facility of Defendant Celanese.[1]  (DX-1, Rios Dep., p. 20; PX-A, Rios Aff., ¶ 2).  The Bishop facility

---

[1] Specifically, the Bishop facility was a facility of Ticona Engineering Polymers, a wholly-owned subsidiary of Defendant Celanese.  (PX-J, Ticona Engineering Polymers Information; PX-I, Defendant's Response to EEOC, p. 1).

produces Ibuprofen and compounded polymer resins.  (PX-I, Defendant's Response to EEOC, p. 1).  At the time of the events in question in this lawsuit, Plaintiff was employed as an "operator" in the Ibuprofen unit at the Bishop facility.  (Id.).  Plaintiff's duties as an operator involved operating the unit, monitoring pressure, transferring product, and completing other tasks associated with the operation of the production equipment.  (Rios Dep., pp. 26-27; Rios Aff., ¶ 3).  In conjunction with his duties as an operator, Plaintiff occasionally "stepped-up" to serve as a lead operator, whereby Plaintiff would lead a shift of five to six people working in the Ibuprofen unit. (Rios Dep., pp. 24-25).  While Plaintiff was employed in the Ibuprofen unit, the unit manager/supervisor was Rick Rod.  (Id., pp. 20-21).  During the events in question in this lawsuit, Plaintiff's immediate supervisor was Dan Brzenski.  (Id.).

In the spring of 2005, Plaintiff raised an issue to his supervisor Dan Brzenski and to the Celanese Human Resources Department regarding "step-up pay."  (Id., pp. 70-77; DX-2, Emails between Plaintiff and Nadia Soliz).  Plaintiff indicated his view that Celanese was not complying with its own policy to pay a higher rate to employees who "stepped-up" to assume additional duties.  (Id.).  Plaintiff emailed a copy of the policy in question to Nadia Soliz of the Human Resources Department, and Ms. Soliz replied to Plaintiff, indicating that management was addressing Plaintiff's concerns.  (Id.).  After Plaintiff raised the issue regarding step-up pay, Plaintiff complained to the unit manager/supervisor Rick Rod that Plaintiff was having issues with his direct supervisor, Dan Brzenski.  (Rios Dep., pp. 70-87).  Specifically, Plaintiff complained to Mr. Rod that Mr. Brzenski gave a verbal warning to Plaintiff regarding Plaintiff's practices as to sick leave.  (Id., p. 87).  Plaintiff later complained to Mr. Rod that Plaintiff thought Mr. Brzenski was rude to Plaintiff.  (Id., pp. 92-97).  Mr. Rod indicated that he would

work on Plaintiff's concerns.  (Id., p. 101).  This second meeting with Mr. Rod took place in early December, 2005.  (Defendant's Response to EEOC, p. 4).

On the night of December 7, 2005, contract workers were scheduled to come in and do maintenance on a "vessel" used to manufacture ibuprofen.  (Rios Dep., pp. 148-151; DX-8, Energy Isolation Plan).  The maintenance contractors were scheduled to begin their work on vessel 8612 around 9:00 PM, and the work was to continue through the night.  (Id.).  In order for workers to enter a vessel to perform maintenance, the vessel must be cleaned and secured for safety purposes.  (Id.).  This securing includes closing all valves to make sure gases and chemicals cannot flow into the vessel and harm the maintenance worker, and also "blinding" the vessel as a double-check to make sure that gases/chemicals cannot enter the vessel while work is being performed.  (Id.).  The "blinding" process includes putting blinds in front of the valves leading into the vessel, to ensure that nothing can flow into the vessel and harm the maintenance employee.  (Id.).  Before the maintenance contractor enters the vessel, Celanese requires that an "entry permit" be finalized and signed by a Celanese employee and a representative of the maintenance contractor.  (Rios Dep., pp. 151-152).  On the night in question, Plaintiff signed a "Safety Checklist" and a "Confined Space Entry/Hot Work Permit" regarding vessel 8612.  (Rios Dep., pp. 158, 161; DX-5, Safety Checklist; DX-7, Confined Space Entry/Hot Work Permit). Plaintiff signed the Safety Checklist as the "Owning Area Representative."  (Safety Checklist). Per the Safety Checklist, Plaintiff signed off that field verification had occurred, checking that the equipment had been "cleared, depressurized and isolated".  (Id.).  Plaintiff signed the Confined Space Entry/Hot Work Permit as the "Issuer."  (Confined Space Entry/Hot Work Permit).  Per the Permit, Plaintiff signed off that the isolation plan and safety checklist had been completed.  (Id.).   However, Plaintiff did not actually physically verify that the safety blinds

were in place at the time Plaintiff signed the above-referenced paperwork.  (Rios Dep., pp. 159-160).  Rather, at the time Plaintiff signed the paperwork, Plaintiff was busy working on plugging lines into the vessel.  (Id.).  It later turned out that one of the blinds was not in the proper place at the time the maintenance worker went into the vessel.  (Id., p. 179; Defendant's Response to EEOC, p. 5).

On or about December 9, 2005, Rick Rod contacted Plaintiff and informed him that he needed to come in to work for a meeting on what occurred with vessel 8612.  (Rios Dep., p. 179).  Plaintiff was off work on a planned vacation day.  (Id.).  Plaintiff attended the meeting, where the individuals present discussed the maintenance on the vessel the previous night.  (Id.).  On or about December 14, 2005, Rick Rod asked Plaintiff to come in to work for another meeting.  (Id., p. 189).  Present at that meeting were Mr. Rod, Plaintiff, and Nadia Soliz from Celanese Human Resources.  (Id.).  At that meeting, Mr. Rod and Ms. Soliz gave Plaintiff a copy of his termination letter, and informed Plaintiff that his employment was being terminated.  (Id.).  The termination letter was signed by Rick Rod.  (DX-9, Termination Letter, p. 2).[2]  Per the termination letter, Plaintiff's employment was terminated effective December 14, 2005, "for behaviors that violate the company's standards and are considered intolerable offenses."  (Id., p. 1).  The letter describes these intolerable offenses as:  (1) failure to "identify the precise location of blinds on V-8612 in the field for turnover to maintenance as required by the field verification step of the Work Safety Checklist"; (2) incorrectly following "the Energy Isolation Plan – Secondary Isolation Verification step resulting in not having a required isolation device for subsequent personnel entry into a confined space"; and (3) issuing a "Confined Space Entry Permit without verifying that the Isolation Plan and Safety Checklist conditions were met."  (Id.).

---

[2] No one else was terminated from Celanese as a result of the issues with vessel 8612 on December 7-8, 2005.  (Rios Dep., p. 195).

The letter indicates that these behaviors violated various Celanese policies and "created a very high risk and unsafe environment for the employee who entered the confined space." (Id.). The letter also indicates that Plaintiff's violation of certain Celanese policies constituted an "intolerable offense" and subjected Plaintiff to immediate termination under the "Bishop Administrative Procedure for Corrective Action" Policy IV-6. (Id.). Policy IV-6 indicates that intolerable offenses are offenses that will subject an employee to immediate termination, and indicates that such intolerable offenses include "willful violation" of administrative procedures regarding a confined space permit and/or energy isolation. (DX-10, Policy IV-6, pp. 1, 6-7).

At the December 14, 2005 meeting where Plaintiff was informed of his termination, Ms. Soliz from Human Resources indicated that Plaintiff could speak with Bishop Site Director Darren Collins regarding the termination. (Rios Dep., p. 190). The termination letter provided to Plaintiff also indicated that Plaintiff could appeal his termination to Mr. Collins. (Termination Letter, p. 1). Plaintiff later met with Mr. Collins, in an attempt to seek reinstatement to his operator position. (Rios Dep., p. 143-147; DX-16, Collins Decl., ¶ 11). Plaintiff spoke with Mr. Collins regarding what occurred on the night in question, and Plaintiff indicated that he wanted his job back. (Id.). At the time of Plaintiff's termination, Mr. Collins served as Site Director of the Bishop facility, and Mr. Rodolfo Morales, Jr. served as the facility's Environmental Health, Safety and Technical ("EHS") Manager. (DX-15, Morales Decl., ¶ 2; Collins Decl., ¶ 2). Mr. Collins became the Site Director in February, 2005, and Mr. Morales became the EHS Manager in November, 2005. (Collins Decl., ¶ 2; Morales Decl., ¶ 2). Mr. Collins declined to grant Plaintiff's request for reinstatement to his operator position. (Collins Decl., ¶ 11).

Following his discharge from Celanese, Plaintiff was unemployed for a period of time, and Plaintiff has since worked for Schlumberger in Alice, Texas, and for a uranium mining

company in South Texas.  (Rios Dep., pp. 9-12, 32-33).[3]  After Plaintiff was discharged from Celanese, Plaintiff conducted a search for new employment, including applying to jobs in the Rio Grande Valley and Corpus Christi areas of Texas.  (Rios Dep., pp. 34-37; Rios Aff., ¶ 21; PX-L1, L2, L3, Job Search Documents).

## III.    Procedural Background

Plaintiff filed his "Original Complaint and Jury Demand" against Defendant Celanese on January 22, 2008 (D.E. 1).  In this Complaint, Plaintiff brought the following claims against the Defendant:  (1) a claim for discrimination in violation of Title VII, on the basis of Plaintiff's race, color and/or national origin[4]; (2) a claim for breach of contract (under Texas common law); and (3) a claim for promissory estoppel (also under Texas common law).  (Complaint, ¶¶ 29-48).

The Court held an initial pretrial and scheduling conference in the case on March 10, 2008.  At that conference, Plaintiff voluntarily dismissed his Texas state law claims for breach of contract and promissory estoppel.  On March 11, 2008, the Court accordingly issued an order dismissing Plaintiff's breach of contract and promissory estoppel causes of action (D.E. 14).[5]

---

[3] In addition to his work at Celanese, Plaintiff had experience working in various oil fields and for a uranium mining company.  (Rios Dep., pp. 9-12).  Plaintiff's educational background includes a high school diploma and some college courses at Texas A&I University.  (PX-L1, L2, L3, Job Search Documents).

[4] Plaintiff states that he also brings his Title VII claim pursuant to 42 U.S.C. § 1981 (hereinafter, "Section 1981"). (Complaint, ¶ 30).

[5] With regard to his breach of contract claim, Plaintiff alleged that Celanese and Plaintiff essentially entered into a "contract," whereby Plaintiff would work for Celanese and Celanese would continue to abide by its various non-discrimination policies.  Plaintiff claimed that Celanese breached this "contract" by allegedly discriminating against Plaintiff on the basis of his race/color/national origin.  (Complaint, ¶¶ 34-48).  With regard to his promissory estoppel claim, Plaintiff alleged that he relied to his detriment on Celanese's promise to abide by its anti-discrimination policies.  Plaintiff claimed that he suffered damages when Celanese failed to comply with its policies and allegedly discriminated against Plaintiff.  (Id.).  Texas law expressly prohibits Plaintiff's breach of contract and promissory estoppel claims.  With regard to breach of contract, compliance with an employer's own policies/procedures does not create a contract of employment with an employee.  See Zimmerman v. H.E. Butt Grocery Co., 932 F.2d 469, 472 (5th Cir. 1991).  Further, employment in Texas is at-will, and if an employee policy or manual does not contain a specific provision stating that the employer will only discharge the employee for "just cause," an employee handbook or policy does not change the at-will employment rule of Texas.  See, e.g., Brown v. Sabre, Inc., 173 S.W.3d 581, 585 (Tex. App--Fort Worth 2005) ("employee handbooks and policy manuals do not create implied contracts between the employer and employee").  With regard to promissory estoppel, unless expressly stated in the policy, an employer's policy does not alter the at-will employment relationship in Texas. See, e.g., Denison Indus. of California, Inc. v. Medrano, 2001 WL 225334, at *5 (Tex. App--Dallas Mar. 8, 2001

Per Plaintiff's Complaint and per the Court's March 11, 2008 Order, Plaintiff's remaining claim against Celanese is a claim for discrimination pursuant to Title VII.  The Court notes that as a part of his claim for Title VII discrimination, Plaintiff also brings a claim for violation of 42 U.S.C. § 1981 ("Section 1981").  (Complaint, ¶ 30).[6]  Accordingly, the Court treats Plaintiff as bringing the following claims against Celanese in this action:  (1) a claim for discrimination in violation of Title VII, on the basis of Plaintiff's race/color/national origin; and (2) and a claim for violation of Section 1981.  Of note, in his Original Complaint, Plaintiff does not bring any claim for retaliation in violation of Title VII.  Plaintiff's response to Defendant's motion for summary judgment appears to indicate that Plaintiff is under the mistaken impression that Plaintiff has a pending Title VII retaliation claim against Celanese.  (D.E. 32, Response, pp. 17,

---

("Although the employee handbook and the time-and-attendance and leave-of-absence policies contain representations that an employee will be terminated if he fails to comply with them, they contain no representation or promise that an employee will not be terminated if he complies with them.").  Plaintiff remained an at-will employee, and cannot bring a promissory estoppel claim in conjunction with any of Celanese's employment policies or manuals.  See id.  Because Texas law does not allow Plaintiff to bring a  promissory estoppel or breach of contract claim in the circumstances alleged in his Complaint, Plaintiff voluntarily dismissed his promissory estoppel and breach of contract causes of action.  (See D.E. 14, Order of Dismissal).

[6] As noted above, Plaintiff appears to try to subsume a Section 1981 claim within his Title VII claim, although Plaintiff never specifically, separately asserts a Section 1981 cause of action.  (See Complaint, ¶ 30, stating that Plaintiff's Title VII claim is "authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, … 42 U.S.C. Section 1981 and 29 C.F.R. 1606.1 … for relief based upon the unlawful employment practices of Defendant Celanese.").  Because Plaintiff appears to attempt to bring a Section 1981 claim as a part of his Title VII cause of action, the Court will treat Plaintiff's Complaint as bringing both Title VII and Section 1981 claims against Defendant Celanese.  However, the Court notes that whether or not Plaintiff does bring a Section 1981 claim is not relevant to the analysis of this Order.  This is because a plaintiff's Section 1981 claim is analyzed under the same standard as the plaintiff's Title VII claim.  See Lawrence v. Univ. of Texas Med. Branch at Galveston, 163 F.3d 309, 311 (5th Cir. 1999) ("Employment discrimination claims brought under 42 U.S.C. § 1981 are analyzed under the evidentiary framework applicable to claims arising under Title VII"); Pratt v. City of Houston, Tex., 247 F.3d 601, 605 (5th Cir. 2001) ("The elements of the claims under Title VII and 42 U.S.C. § 1981 are identical.  We therefore evaluate both claims using the same analysis."); Casarez v. Burlington Northern/Santa Fe Co., 193 F.3d 334, 336 n. 2 (5th Cir. 1999) (internal citations omitted) ("Though [plaintiff] has asserted claims under both Title VII and 42 U.S.C. § 1981, the elements of both claims are identical.  Therefore, we employ only one analysis in evaluating the [plaintiff's] Title VII and § 1981 claims.").  However, the Court does note that Plaintiff may only bring his Section 1981 claim on the basis of race, as Section 1981 does not pertain to claims for national origin discrimination.  See 42 U.S.C. § 1981; see also Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 179 (1982) ("national origin discrimination" is not "cognizable under [Section 1981]").  This is in contrast to Plaintiff's Title VII claim, which he brings on the basis of national origin, color and race.

20, 22).  This is not the case, and Plaintiff has <u>not</u> brought any Title VII retaliation claim against the Defendant in this action.

Defendant Celanese filed its motion for summary judgment on October 15, 2008 (D.E. 30, 31, 32).  Celanese argues that Plaintiff cannot establish a prima facie case of employment discrimination, and that even if Plaintiff could establish such a case, Celanese had a legitimate, non-discriminatory reason for terminating Plaintiff's employment.  Celanese also argues that certain of the allegations Plaintiff raises in his Original Complaint are barred by the statute of limitations, and that Plaintiff failed exhaust his administrative remedies by not filing a complete Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Celanese also argues that Plaintiff's claims for back pay should be limited, because Plaintiff would likely have been terminated anyway as part of a later reduction in force, and because Plaintiff did not make reasonable efforts to obtain substantially similar employment following Plaintiff's termination from Celanese.  Celanese also argues that Plaintiff's claim for emotional distress damages should be dismissed for "lack of proof."  Celanese has submitted evidence in support of its motion for summary judgment.  (<u>See</u> D.E. 29, DX-1 through DX-20).

Plaintiff filed his response to Defendant's motion for summary judgment on November 4, 2008 (D.E. 32-42).  Plaintiff's initial response was struck because Plaintiff filed the main pleading and exhibits in a piecemeal fashion, in violation of the General Order.  (D.E. 43, Strike Order).  After securing leave to re-file his response (per D.E. 47), Plaintiff filed his corrected response on November 14, 2008 (D.E. 48).

In his response, Plaintiff argues that there are numerous factual issues that preclude summary judgment on Plaintiff's claims against Celanese.  Plaintiff argues that he can establish a prima facie case of Title VII discrimination, and that even if Defendant did present a legitimate,

non-discriminatory reason for terminating Plaintiff's employment, Plaintiff has submitted evidence that Defendant's reason was actually pretext for unlawful discrimination. Specifically, Plaintiff claims that that various white, non-Hispanic employees committed violations of life-safety critical policies, some of which were classified as "intolerable offenses" by Celanese, but these employees were not terminated as a result of their actions. Plaintiff claims that Celanese's treatment of Plaintiff as opposed to the treatment of these white, non-Hispanic employees is evidence of pretext. Plaintiff also argues that he did exhaust all required administrative remedies with his Charge of Discrimination, and that none of his allegations are untimely. Plaintiff also claims that he has submitted evidence necessary to sustain his claim for damages resulting from emotional distress, and that he did make reasonable efforts to obtain substantially similar employment following his termination. Plaintiff has submitted evidence to support his response to Defendant's motion for summary judgment. (See D.E. 48, PX-A through PX-L3).

## IV.   Discussion

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56 states that summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; see also Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 435 (5th Cir. 1992).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1046-1047 (5th Cir. 1996). If the nonmovant bears the burden of proof on a claim, the moving party may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. See Celotex Corp., 477 U.S. at 325; Ocean Energy II, Inc. v. Alexander & Alexander, Inc., 868 F.2d 740, 747 (5th Cir. 1989).

Once the moving party has carried its burden, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also Schaefer v. Gulf Coast Reg'l Blood Ctr., 10 F.3d 327, 330 (5th Cir. 1994) (stating that nonmoving party must "produce affirmative and specific facts" demonstrating a genuine issue).

When the parties have submitted evidence of conflicting facts, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Willis, 61 F.3d at 315. Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the nonmoving party, no reasonable jury could return a verdict for that party. See, e.g., Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000).

**B.** **Title VII Discrimination**

Title VII makes it an "unlawful employment practice for an employer to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e2(a)(1).

A plaintiff can prove his allegations with either direct or indirect evidence.  Absent direct evidence of discrimination, courts use the McDonnell Douglas three-part burden shifting framework to analyze a Title VII claim.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Frank v. Xerox Corp., 347 F.3d 130, 137 (5th Cir. 2003).

## 1.      Prima Facie Case of Discrimination

Under this framework, the plaintiff must initially establish a prima facie case of discrimination.  See McDonnell Douglas Corp., 411 U.S. at 802; Johnson v. Louisiana, 351 F.3d 616, 621 (5th Cir. 2003) (citing Medina v. Ramsey Steel Co., Inc., 238 F.3d 674, 680 (5th Cir. 2001)) (the burden lies initially with the plaintiff "to raise a genuine issue of material fact on each element of his prima facie case").  "In order to establish a prima facie case of discrimination on the basis of race or national origin, a plaintiff must show he or she was:  (1) a member of a protected class; (2) qualified for the position held; (3) subject to an adverse employment action; and (4) treated differently from others similarly situated."  Abarca v. Metro. Transit Auth., 404 F.3d 938, 941 (5th Cir. 2005) (citing Rios v. Rossotti, 252 F.3d 375, 378 (5th Cir. 2001)); see also Quintanilla v. K-Bin, Inc., 8 F.Supp.2d 928, 934 (S.D. Tex. 1998) ("To state a prima facie case under [Title VII and Section 1981], Plaintiff must show that (1) he is a member of a protected group; (2) he was qualified for his position; (3) despite his qualifications, he suffered an adverse employment action; and (4) he was replaced by a non-member of the protected class or non-members received more favorable treatment because of their status as non-members of the protected class.").

## 2.   Burden Shifting

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its decision to take an adverse employment action against the plaintiff.  See Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 404 (5th Cir. 1999).  If the employer meets this burden of production, the prima facie case dissolves, and the burden shifts back to the plaintiff to establish that the employer's explanation is merely pretext for unlawful discrimination.  See id.; McDonnell Douglas, 411 U.S. at 805 (stating that the burden shifts back to plaintiff to show that the defendant's justification is "in fact a coverup for a ... discriminatory decision").

## C.   Factual Dispute Regarding Plaintiff's Claim for Title VII Discrimination[7]

For the reasons set forth below, there is a factual dispute as to whether Defendant discriminated against Plaintiff on the basis of Plaintiff's race, color, and/or national origin. Accordingly, Defendant is not entitled to summary judgment on Plaintiff's Title VII (and corresponding Section 1981) cause of action.

### 1.   Prima Facie Case

First, Plaintiff has presented evidence as to create a factual dispute regarding a prima facie case of discrimination.  As set forth above, to establish a prima facie case, Plaintiff must show that he was a member of a protected class, that he was qualified for the position he held, that he was subject to an adverse employment action, and that he was treated differently from others similarly situated.  See Dilworth, 282 Fed.Appx. at 332, 2008 WL 2468397 at *2.  As set

---

[7] As set forth above, Plaintiff also brings a Section 1981 claim against Celanese.  The Court's analysis of Plaintiff's Title VII claim also applies to Plaintiff's Section 1981 claim, since Plaintiff's Section 1981 and Title VII claims are analyzed under the same standard.  See Pratt, 247 F.3d at 605 ("The elements of the claims under Title VII and 42 U.S.C. § 1981 are identical.  We therefore evaluate both claims using the same analysis."); Dilworth v. Cont'l Const. Co. Inc., 282 Fed.Appx. 330, 332, 2008 WL 2468397, at *2 (5th Cir. June 19, 2008) (citing Raggs v. Miss. Power & Light Co., 278 F.3d 463, 468 (5th Cir. 2002)) ("Claims of racial discrimination brought under Title VII or § 1981 are considered 'under the same rubric of analysis.'").  Accordingly, for the purposes of this Order, *when the Court refers to Plaintiff's Title VII claim, the Court also refers to Plaintiff's Section 1981 cause of action*.

forth below, Plaintiff has submitted evidence such that a reasonable factfinder could find that Plaintiff established a prima facie case of discrimination.

First, it is undisputed that Plaintiff, as a Hispanic male, is a member of a protected class. See, e.g., Guerra v. Houston Indep. Sch. Dist., 2005 WL 1155140, at *5 (S.D. Tex. April 27, 2005) ("The parties do not dispute the fact that [the plaintiff], a Hispanic male, is a member of a protected class."); Pena v. Alumina, 2005 WL 1155166, at *6 (S.D. Tex. May 11, 2005) (same).

Second, Plaintiff has submitted evidence that he was qualified for the position he held, as an operator in the Ibuprofen unit at Celanese. Specifically, Plaintiff has submitted evidence that he held the operator position at Celanese for a approximately 13 years, a significant period of time. (Rios Aff., ¶ 2; Defendant's Response to EEOC, p. 2). Plaintiff has submitted evidence that he was a "well-regarded" operator who was routinely selected to "step-up" and serve as a lead operator, supervising five to six other operators working in the Ibuprofen unit. (Rios Dep., pp. 24-25; Rios Aff., ¶¶ 3-4). Also of note, Defendant submitted as evidence Plaintiff's recent performance reviews from 2002 and 2004. (DX-18, 2002 Performance Review; DX-19, 2004 Performance Review). In the 2002 review, Plaintiff was rated mainly as "appropriate" for his job level, and he received ratings of "role model" in the areas of customer focus and teamwork and cooperation. (2002 Performance Review, p. 1). The review indicates that Plaintiff had strengths in courage, customer focus, team work and work ethic. (Id.). In the 2004 review, Plaintiff was again rated mainly as "appropriate" for his job level, and his strengths were listed as having good networks and relations within the plant, courage, team work and work ethic. (2004 Performance Review, p. 1). The 2004 review indicates that Plaintiff's "overall performance" "meets expectations". (Id.). Overall, the reviews submitted by Defendant, along with the evidence submitted by Plaintiff, indicate that Plaintiff was qualified to serve as an

operator in the Bishop facility Ibuprofen unit.   (2002 and 2004 Performance Reviews; Rios Dep., pp. 24-25; Rios Aff., ¶¶ 3-4).

Third, it is undisputed that Plaintiff was subject to an adverse employment action, as he was terminated from his employment effective December 14, 2005.  (Termination Letter; Rios Dep., pp. 179, 189-190).   "[T]here is no dispute that termination constitutes an adverse employment action".  Blackwell v. Laque, 275 Fed.Appx. 363, 370 n. 8, 2008 WL 1848119, at *6 (5th Cir. April 24, 2008); see also Grubb v. Southwest Airlines, 2008 WL 4538313, at *6 (5th Cir. Oct. 10, 2008) ("Obviously, [plaintiff] suffered an adverse employment action by virtue of his termination").

Finally, as discussed more fully below with respect to the issue of pretext, Plaintiff has submitted evidence that he was treated differently from others similarly situated.  Specifically, Plaintiff has submitted evidence that certain white, non-Hispanic Celanese employees, at least one of whom also worked under unit manager/supervisor Rick Rod, also committed alleged "intolerable offenses" and/or violated life safety critical policies, yet these employees were not disciplined or terminated as a result of their actions.  (Rios Dep., pp. 159-160, 179, 212-215; Rios Aff., ¶ 18; Policy IV-6, pp. 1, 6).  Because these employees were not disciplined and/or terminated, yet the employees committed essentially the same alleged safety violations as Plaintiff, Plaintiff has submitted evidence that he was treated differently from others similarly situated. (Id.).

> 2.      **Defendant's Legitimate, Non-Discriminatory Reason for Plaintiff's**
>        **Termination**

As noted above, once Plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for its decision regarding the adverse employment action.[8]  See Shackleford, 190 F.3d at 404.

In this case, Defendant Celanese has submitted evidence indicating that it terminated Plaintiff for a legitimate, non-discriminatory reason, namely, committing an "intolerable offense" and failing to abide by company policy.  (Termination Letter, p. 1).  Specifically, Defendant submitted evidence showing that on December 7-8, 2005, Plaintiff signed a "Safety Checklist" and "Confined Space Entry/Hot Work Permit," signing off that field verification had occurred and that vessel 8612 had been "cleared, depressurized and isolated."  (Safety Checklist; Confined Space Entry/Hot Work Permit).  Defendant has also submitted evidence that Plaintiff did not physically verify that all safety blinds were in place when he signed the above-referenced paperwork, and it was later determined that one of the safety blinds was not placed in the proper position.  (Rios Dep., pp. 159-160, 179; Defendant's Response to EEOC, p. 5).  Celanese Policy IV-6, "Bishop Administrative Procedure for Corrective Action" states that certain offenses are "intolerable offenses" that will subject an employee to "immediate termination."  (Policy IV-6, p. 1).  Specifically, Policy IV-6 states that the following constitutes an "intolerable offense":

Willful violation of the following Administrative Procedures:

08-01-14 Hot Work Permit

08-01-13 Confined Space Permit

08-01-53 Excavation Permit

---

[8] The Court notes that it does not hold that Plaintiff has definitively established a prima facie case of discrimination in this matter.  Rather, Plaintiff has submitted enough evidence such that a reasonable factfinder could find that Plaintiff has established a prima facie case, allowing the Court to move along in its Title VII analysis.

08-01-12 Energy Isolation (Lock-Out, Tag-Out)

(Id., p. 6). Defendant maintains that Plaintiff violated the confined space permit and energy isolation policies, which are classified as "intolerable offenses" under Policy IV-6. (Termination Letter, p. 1).

In sum, Defendant states that it terminated Plaintiff because Plaintiff violated certain company policies via his actions on December 7-8, 2005. (Termination Letter, p. 1, stating that Plaintiff was terminated for "behaviors that violate the company's standards and are considered intolerable offenses"; Morales Decl., ¶ 11, stating that as EHS Manager, Mr. Morales recommended that Plaintiff be dismissed "for flagrant violations of life critical safety procedures which could have resulted in serious injury and possibly death"; Collins Decl., ¶ 6, stating that "Plaintiff was dismissed because of his violation of life critical safety procedures, and the manner in which he handled the process and failed to follow those procedures"). Accordingly, Defendant has submitted a legitimate, non-discriminatory reason for its decision to terminate Plaintiff's employment, and the burden now shifts to Plaintiff to establish that Defendant's justification is merely pretext for unlawful discrimination. See McDonnell Douglas, 411 U.S. at 805.

### 3.      Factual Dispute Regarding Pretext

In this case, Plaintiff has submitted evidence which creates a factual dispute as to whether Defendant's legitimate, non-discriminatory reason for terminating Plaintiff's employment was actually pretext for unlawful discrimination. Specifically, as set forth below, Plaintiff has submitted evidence showing that several white, non-Hispanic employees also committed what would be classified as "intolerable offenses" and/or violations of life critical safety procedures, yet these employees were not disciplined or terminated because of their actions.

### a.      <u>Dan Nau Sleeping on the Job</u>

First, Plaintiff has submitted evidence that Celanese operator Dan Nau, a white, non-Hispanic employee, frequently slept on the job in the Ibuprofen unit at Celanese, and that Mr. Nau's sleeping on the job had been reported to unit manager/supervisor Rick Rod.   (<u>See</u>, <u>e.g.</u>, Rios Dep., pp. 212-214, stating that Mr. Rios saw Mr. Nau sleeping on the job on several occasions in 2003, 2004 and 2005, that it was well known that Mr. Nau slept on the job, and that Mr. Rod was aware that Mr. Nau had been sleeping on the job).   In response to requests for information from the EEOC, current and former Celanese operators submitted signed statements indicating that Mr. Nau frequently slept on the job, and that Mr. Nau's practice of sleeping at work was known to unit manager/supervisor Rick Rod.   Specifically, current Celanese operator Alfredo Ortiz wrote that he had first-hand knowledge of Dan Nau frequently sleeping on the job, and Mr. Ortiz indicated that Mr. Nau continues to sleep on the job to the present day.   (PX-E, Ortiz Response to EEOC).   Mr. Ortiz also indicated that Rick Rod was aware of Mr. Nau sleeping at the job, and that Mr. Rod "said that well I can see some of us taking power naps if needed."  (<u>Id.</u>).   Former Celanese operator Jaime Benavides, who worked at Celanese from 1980 to 2003, responded to the EEOC's request for information as follows:  "I reported Dan Nau's sleeping to Rick Rod on [*sic*] March 2003.  He [Mr. Rod] assured me that he would speak to Dan Nau and sleeping would not be tolerated.  The sleeping continued and no action was taken." (PX-G, Benavides Response to EEOC).

Policy IV-6, which states that intolerable offenses will subject an employee to immediate termination, classifies "intentionally sleeping while on duty" as an "intolerable offense"  (Policy IV-6, pp. 1, 6).   As of the present time, white, non-Hispanic employee Dan Nau has not been

terminated from his employment at Celanese.  (Ortiz and Benavides Responses to EEOC; Rios Dep., pp. 212-214).

### b.   <u>Situation regarding Kodi Burros</u>

Plaintiff has also submitted evidence that white, non-Hispanic Celanese employee Kodi Burros failed to wear his Personal Protective Equipment ("PPE") on a particular occasion, causing Mr. Burrows to receive serious burns.  (Rios Aff., ¶ 18; Ortiz and Benavides Responses to EEOC).  Specifically, in response to the EEOC's request for information regarding Mr. Burrows, current Celanese operator Alfredo Ortiz stated that Mr. Burros violated administrative procedures and engaged in unsafe acts by not wearing his PPE, and that Mr. Burros was injured as a result of his actions.  (Ortiz Response to EEOC).  Also in response to the EEOC's request for information, former Celanese operator Jaime Benavides stated that Mr. Burrows failed to wear PPE when it was required to perform the job.  (Benavides Response to EEOC).  Further, Plaintiff also submitted evidence that on two occasions, Mr. Burrows improperly vented dangerous hexane vapors, in violation of company standard operating procedures, and that management was aware of Mr. Burrows' actions.  (Rios Aff., ¶ 18; Rios Dep., p. 215).  Plaintiff has submitted evidence that Mr. Burrows is still employed at Celanese at the present time, and has not been disciplined for any of the above-referenced actions.  (Ortiz Response to EEOC; Rios Dep., p. 215).

### c.   <u>Situation Regarding Bill Dobe</u>

Plaintiff has also submitted evidence that white, non-Hispanic operator Bill Dobe improperly issued a maintenance permit to break open a condensate line, and when maintenance worker Oscar Garcia broke the line, Mr. Garcia received serious second degree burns.  (Rios Aff., ¶ 18).  Specifically, Plaintiff submitted evidence that Mr. Dobe issued the permit before

verifying that the condensate line was empty and blocked off, and that when maintenance worker Garcia opened the line, the line was filled with condensate and caused injury to Mr. Garcia. (Id.).  In response to the EEOC's request for information regarding Mr. Dobe, current Celanese operator Alfredo Ortiz stated that Bill Dobe "burned Mr. Oscar Garcia [the maintenance worker]" and that "Mr. Dobe violated the company's policy for line breaking, and didn't follow the lockout/tag-out policy".  (Ortiz Response to EEOC).   Former Celanese operator Jaime Benavides stated to the EEOC that Mr. Dobe "did not follow procedures" in issuing a permit to break the condensate line, and that Mr. Dobe may have "failed to identify and confirm all proper valves were isolated, locked out and bleeders open".  (Benavides Response to EEOC).  Plaintiff has submitted evidence that Mr. Dobe was not disciplined with regard to the incident with the condensate line, and that Mr. Dobe is still employed at Celanese.  (Ortiz Response to EEOC; Rios Aff., ¶ 18).

### d.      Pretext for Unlawful Discrimination

In this case, as set forth above, Plaintiff has submitted evidence that white, non-Hispanic fellow employees at Celanese, who may have committed "intolerable offenses" or violated life-critical safety procedures, were not disciplined or terminated as a result of their actions.  (Ortiz and Benavides Responses to EEOC; Rios Aff., ¶ 18; Rios Dep., pp. 159-160, 179, 212-215).[9]

---

[9] The Court notes Defendant's unpersuasive argument that Messrs. Burrows, Dobe and Nau were not in "nearly identical circumstances" to Plaintiff, because Mr. Rodolfo Morales, Jr. had only come on as EHS Manager in November, 2005, and because there was increased plant safety vigilance following an incident at another facility in March, 2005.  (D.E. 31, p. 18).  See, e.g., Wyvill v. United Cos. Life. Ins. Co., 212 F.3d 296, 304-05 (5th Cir. 2000) (requiring a plaintiff, to demonstrate pretext, to show that employer treated others differently in "nearly identical circumstances").  Plaintiff has submitted evidence that Mr. Nau has continued sleeping on the job during the pendency of this lawsuit, which would be after the "increased safety vigilance" and after Mr. Morales took over as EHS Manager.  (Ortiz Response to EEOC, stating that "Mr. Nau *till this day* sleeps" on the job) (emphasis added).  Defendant's arguments regarding Mr. Morales' start date and increased safety awareness are relevant to the factfinder's ultimate determination on whether Defendant illegally discriminated against Plaintiff.  However, Defendant's arguments do not eliminate the factual issue regarding pretext, and Defendant is not entitled to summary judgment on Plaintiff's Title VII (and corresponding Section 1981) cause of action.  Moreover, the Court also notes that Plaintiff has presented evidence of the extraordinary similarities of Messrs. Nau, Dobe and Burrows' situations to that of Plaintiff.  These similarities include, but are not limited to, employment positions, employment

Further, with regard to the situations of Messrs. Burrows and Dobe, actual injuries resulted from the alleged violations of company policies, in contrast to Plaintiff's situation, where the maintenance contractor was not actually hurt as a result of the misplaced blind.  (Ortiz and Benavides Responses to EEOC).  Accordingly, based on the evidence submitted by Plaintiff, there is a factual issue as to whether Celanese's legitimate, non-discriminatory reason for terminating Plaintiff was actually pretext for unlawful discrimination.  Defendant is thus not entitled to summary judgment on Plaintiff's Title VII (and corresponding Section 1981) cause of action.  See, e.g., Hadad v. American Airlines, Inc., 2003 WL 292170, at *3 (N.D. Tex. Feb. 7, 2003) (denying summary judgment on the plaintiff's Title VII and Section 1981 claims, where the plaintiff raised a genuine issue of material fact as to whether the employer's asserted justification for termination was pretext for unlawful discrimination).[10]

---

responsibilities, supervisors, timing and alleged policy violations (even down to specific Celanese policies). Plaintiff has submitted enough evidence to overcome summary judgment on this point.

[10] The Court notes Defendant's unpersuasive arguments regarding the statute of limitations and alleged deficiencies in Plaintiff's Charge of Discrimination.  First, Defendant claims that Plaintiff did not exhaust his administrative remedies, because Plaintiff's Charge of Discrimination only specifies discrimination on account of Plaintiff's national origin, and does not make specific reference to discrimination on the basis of race or color.  (D.E. 31, pp. 10-11).  This argument is does not have merit.  First, Plaintiff does make reference to race/color in his Charge, as Plaintiff claims he was discriminated against because he was "Hispanic," and Plaintiff refers to Messrs. Rod and Brzenski on several occasions as "White."  (DX-13, Charge of Discrimination, EEOC Affidavit).  Further, a Title VII a cause of action "may be based, not only upon the specific complaints made by the employee's initial EEOC charge, but also upon *any* kind of discrimination like *or related to* the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination." Fellows v. Universal Restaurants, Inc., 701 F.2d 447, 451 (5th Cir. 1983) (emphasis added); Thomas v. Texas Dept. of Crim. Justice, 220 F.3d 389, 395 (5th Cir. 2000)  ("The scope of a Title VII complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination").  The Fifth Circuit requires that an administrative charge be construed with the utmost liberality.  See Danner v. Phillips Petroleum Co., 447 F.2d 159, 161-62 (5th Cir. 1971).  In this case, Plaintiff's race/color allegations are clearly related to his allegation of discrimination on the basis of his national origin, which he identifies as "Hispanic." (Charge of Discrimination, EEOC Affidavit).  It is reasonable that Plaintiff's race/color allegations would be included within the scope of the EEOC investigation resulting from Plaintiff's Charge of Discrimination.  Thus, Defendant's argument on this issue has no merit.  See Fellows, 701 F.2d at 451.  With regard to the statute of limitations, Defendant claims that certain of the allegations in Plaintiff's Complaint concern events that occurred more than 300 days before Plaintiff filed his Charge of Discrimination, rendering those allegations untimely.  (D.E. 31, pp. 8-9).  This argument is unpersuasive.  First, Plaintiff's Title VII claim is essentially based on his termination from Celanese, which occurred less than 300 days before he filed his Charge of Discrimination.  Further, the Fifth Circuit has "recognized what is called a 'continuing violation theory' in the context of determining whether a Title VII claim is time-barred."  Vidal v. Chertoff, 2008 WL 4280320, at *3 (5th Cir. Sept. 19, 2008) (citing Huckabay v. Moore, 142 F.3d 233, 238 (5th Cir. 1998)).  "The continuing violation theory 'relieves a plaintiff who makes such a

**D.**   **Defendant's Request for Limitation of Back Pay Damages**

Defendant seeks to limit Plaintiff's claims for back pay, on the grounds that (1) Plaintiff did not make reasonable efforts to secure substantially similar employment after he was terminated from Celanese; and (2) because of a subsequent reduction in force Defendant claims that Plaintiff would have been "unlikely" to survive, given his work history.  (D.E. 31, pp. 20-21).  For the reasons set forth below, the Court declines to limit Plaintiff's claims for back pay in this case.

**1.**   **Requirement to Mitigate Damages**

"Title VII requires plaintiffs to mitigate damages by being reasonably diligent in seeking employment substantially equivalent to the position lost."  Voskuil v. Environmental Health Center-Dallas, 1997 WL 527309, at *7 (N.D. Tex. Aug. 18, 1997) (citing Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32 (1982)); Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1045 (5th Cir. 1998) ("A Title VII plaintiff has a duty to mitigate h[is] damages by using reasonable diligence to obtain substantially equivalent employment"); Vaughn v. Sabine County, 104 Fed.Appx. 980, 984, 2004 WL 1683099, at *3 (5th Cir. July 28, 2004) ("Under Title VII, a plaintiff may receive back pay as long as [h]e uses reasonable diligence in finding substantially equivalent employment."); Higgins v. Wal-Mart Stores, Inc., 1998 WL 760283, at *6 (N.D. Tex. Oct. 23,

---

claim from the burden of proving that the entire violation occurred within the actionable period.'"  Vidal, 2008 WL 4280320 at *3 (citing Berry v. Bd. of Sup'rs of L.S.U., 715 F.2d 971, 979 (5th Cir. 1983).  "Specifically, to demonstrate a 'continuing violation for these purposes it is said that the plaintiff must show a series of related acts, one or more of which falls within the [limitations] period.'"  Id.  "The question is 'what event, in fairness and logic, should have alerted the average lay person to act to protect his rights.'"  Vidal, 2008 WL 4280320 at *3 (citing Huckabay, 142 F.3d at 238).  In this case, Plaintiff has presented evidence regarding a "continuing violation" that would encompass the earlier events detailed in his Complaint, culminating with Plaintiff's termination in December, 2005.  (See, e.g., Rios Aff., ¶¶ 1-20).  These earlier incidents would have been less severe examples of an overall pattern of alleged discrimination, leading up 4to Plaintiff's termination.  Plaintiff's termination would have thus alerted Plaintiff that he had to act to pursue his Title VII cause of action.  See Huckabay, 142 F.3d at 238. Accordingly, the Court rejects Defendant's argument that certain of Plaintiff's claims are time-barred.

1998) ("It is a well settled principle of law that an injured person must take reasonable measures to mitigate damages -- in this case, to seek other employment").

"Although a Title VII claimant has a duty to mitigate h[is] damages, [h]e has no obligation to accept employment that is not substantially equivalent to h[is] prior employment in order to minimize damages." Vaughn, 104 Fed.Appx. at 984, 2004 WL 1683099 at *3. "Substantially equivalent employment for purposes of Title VII mitigation has been defined as employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated. In addition, the new position should provide comparable hours to the previous position." Sellers v. Delgado College, 902 F.2d 1189, 1193 (5th Cir. 1990) (internal citations and quotations omitted); see also Vaughn, 104 Fed.Appx. at 984, 2004 WL 1683099 at *3. Of note, "the burden is on the employer to prove failure to mitigate." Migis, 135 F.3d at 1045.

## 2.    Factual Dispute as to Whether Plaintiff's Search Was Reasonably Diligent

In this case, it is undisputed that Plaintiff did attempt to seek alternative employment after he was terminated from Celanese. (Rios Dep., pp. 34-37; Rios Aff., ¶ 21; Job Search Documents). However, there is a factual dispute as to whether Plaintiff made a "reasonably diligent" search for substantially equivalent employment, thus fulfilling his duty to mitigate his damages. This factual dispute precludes summary judgment for the Defendant on the issue of Plaintiff's request for back pay.

"The reasonableness of a Title VII claimant's diligence [in searching for substantially equivalent employment] 'should be evaluated in light of the individual characteristics of the

claimant and the job market.'"  Sellers, 902 F.2d at 1193 (citing Rasimas v. Michigan Dept. of

Mental Health, 714 F.2d 614, 624 (6th Cir. 1983)); Vaughn, 104 Fed.Appx. at 984, 2004 WL

1683099 at *3 ("A court evaluates the reasonableness of a Title VII claimant's diligence in light

of the individual characteristics of the claimant and the job market ").  "[T]here necessarily exists

a spectrum in the law regarding findings of 'reasonable diligence.'"  Morgan v. Neiman-Marcus

Group, Inc./Neiman-Marcus Direct, 2005 WL 3500314, at *9 (N.D. Tex. Dec. 20, 2005).

       In this case, Defendants argue that Plaintiff unreasonably limited his job search to "South

Texas."  However, whether or not Plaintiff has used reasonable diligence to obtain substantially

equivalent employment is a question of fact, and there is a factual issue as to whether Plaintiff

fulfilled his duty to mitigate by conducting the required reasonably diligent search.  Plaintiff has

submitted evidence that he submitted "several hundred hours searching and applying for new

positions, both inside and outside of the chemical services industries."  (Rios Aff., ¶ 21).

Plaintiff has submitted evidence that he applied for positions throughout South Texas, including

at least one position in Victoria, Texas, several positions in the Rio Grade Valley area, and

several positions in the Corpus Christi and Kingsville, Texas areas.   (Id.; Job Search

Documents).  Plaintiff's summary judgment evidence also indicates that he applied for a wide

variety of positions, including operations positions at chemical companies, positions with oil

companies, a position as a transportation security officer (airport screener), a position with the

U.S. Postal Service, a position as an administrative assistant, and the position of "laborer" at

NAS Kingsville in Kingsville, Texas.  (Id.).

       As noted above, the reasonableness of Plaintiff's job search is evaluated in light of

Plaintiff's characteristics and the particular job market at hand.  See Vaughn, 104 Fed.Appx. at

984, 2004 WL 1683099 at *3.    In this case, Plaintiff has submitted evidence such that a

reasonable juror could find that Plaintiff conducted a reasonably diligent job search, precluding summary judgment for the Defendant on this issue.  Specifically, Plaintiff's job search covered a wide geographic area, including the Corpus Christi/Kingsville area, but extending out to Victoria, Refugio and the Rio Grande Valley.[11]  (Job Search Documents).   Plaintiff has essentially applied for work all over South Texas, which covers a wide range of territory.  (Id.). For example, the distance between Victoria, Texas and McAllen, Texas (in the Rio Grande Valley) is approximately 225 miles.  If Plaintiff did secure employment in a distant location such as the Rio Grande Valley, this would most likely require Plaintiff [and perhaps his family] to relocate from his current  home in Bishop, Texas.[12]  Further, Plaintiff also applied for a wide range of positions.  Not only did Plaintiff apply for operations positions in chemical and oil companies, Plaintiff also applied for a position with the U.S. Postal Service, a position as an administrative assistant, a position as an airport security screener, and a position as a "laborer."[13] (Job Search Documents).  Given the geographic and substantive breadth of Plaintiff's job search, a reasonable juror could determine that Plaintiff did exercise reasonable diligence in searching for substantively similar employment.  Accordingly, summary judgment is not appropriate on this issue, and the Court must deny Defendant's request for summary judgment on Plaintiff's request for back pay damages.  See, e.g., Morgan, 2005 WL 3500314 at *10 ("The court therefore finds that a reasonable jury could conclude either way regarding [plaintiff's] diligence in searching for employment after her termination and before obtaining [new] employment[.] …

---

[11] Plaintiff even appears to have applied for a job located in West Texas, and a job located in Mohave Valley, Arizona.  (Job Search Documents, Application for Oxy Production Technician, Job ID 4701, Location:  "US-TX-Various West Texas Cities", and Application for Calpine Operator Technician B, Location "South Point Energy Center, Mohave Valley, AZ").  These job locations would be even further away from Plaintiff's current home location.

[12] The approximate distance between Bishop, Texas and McAllen, Texas (in the Rio Grande Valley) is 120 miles.

[13] Specifically, with respect to the laborer position, the job responsibilities included "upkeep or roads", "dig[ging] ditches", and "[a]ssist[ing] maintenance workers by cleaning and removing site debris".  (Job Search Documents, Laborer Description).

Finding a genuine issue of material fact regarding this issue, the court concludes that [defendant] has not sustained its summary judgment burden, and its motion for summary judgment must therefore be denied.").[14]

**E.     Defendant's Request for Dismissal of Plaintiff's Claim for Emotional Distress Damages**

Defendant also argues that Plaintiff's claim for emotional distress damages should be "dismissed for lack of proof". (D.E. 31, p. 21). Defendant essentially argues that Plaintiff's emotional distress damages claim should be dismissed because Plaintiff has not undergone counseling or medical treatment, or been diagnosed with depression or another mental illness. (Id.). However, Plaintiff has submitted evidence to create a fact issue as to whether or not he is entitled to emotional distress damages, and summary judgment is not appropriate on this matter.

"To be entitled to mental anguish damages, a plaintiff must show a discernible injury to the victim's mental state and submit evidence regarding the nature and extent of the alleged harm." E.E.O.C. v. WC&M Enterprises, Inc., 496 F.3d 393, 402 (5th Cir. 2007). In this case, Plaintiff has submitted evidence that he has indeed suffered severe emotional distress, physically manifesting itself as sleeplessness and loss of appetite, since his termination from Celanese. (Rios Aff., ¶ 20). Further, Plaintiff has submitted evidence that the reason he did not seek medical treatment was because of his financial situation, with money short after he lost his job. (Id.; Rios Dep., pp. 59-60). Specifically, Plaintiff states as follows in his affidavit:

> Since my termination from Celanese, I have experienced significant symptoms of emotional distress. … Since I was terminated my finances have been extremely

---

[14] Further, the Court declines to limit Plaintiff's back pay claims on the grounds that it is "unlikely" Plaintiff would have survived a subsequent reduction in force at the Bishop facility. (D.E. 31, p. 21). Such argument is pure speculation on the part of the Defendant, as a variety of factors may have factored in to how Plaintiff would have fared in the reduction in force. For example, Plaintiff's prior work history as a "step-up" and survival of past reductions in force may have played to his favor and prevented termination in the 2005-2006 RIF. The Court cannot grant summary judgment to Defendant on the back pay issue based only on speculation as to whether Plaintiff would have been terminated at a later date.

stretched and I have been unable to afford professional counseling.  I have been angry, withdrawn and depressed.  I have experienced significant feelings of inadequacy and failure based on my inability to provide financial or emotional support to my family.  Because of what I experienced I have been unable to sleep or eat, and have felt like a constant failure and disappointment to my family and friends.  I have been unable to be physically affectionate with my wife, and have argued near constantly with my children.  I recall feeling particularly inadequate around the time of my daughter's wedding and my son's graduation.  I was unable to provide my daughter with financial or emotional support because of my termination from Celanese.  I was also unable to assist my son financially with his college tuition or graduation expenses, which again, made me feel like a failure as a man and as a father.

(Rios Aff., ¶ 20; <u>see also</u> Rios Dep., p. 59, Plaintiff stating that he has experienced "a lot of stress" and "family issues with money").  Further, while Defendant makes much out of Plaintiff not having gone to a doctor or to receive psychological counseling, Plaintiff testified that what he experienced "would have" been serious enough to see a doctor, but he was "using his savings to pay off bills" and was experiencing significant financial problems due to his loss of income. (Rios Dep., pp. 59-60).  Such evidence is sufficient to survive summary judgment on Plaintiff's claim for emotional distress damages, and Defendant's motion for summary judgment must be denied on this issue.  <u>See</u>, <u>e.g.</u>, <u>WC&M Enterprises, Inc.</u>, 496 F.3d 393, 402 ("Compensable emotional distress may manifest itself ... as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, or a nervous breakdown"); <u>see also</u> <u>Cousin v. Trans Union Corp.</u>, 246 F.3d 359, 371 (5th Cir. 2001) (medical or psychological evidence is not necessarily required to support an emotional distress damage award).

**V.**   **Conclusion**

For the reasons set forth above, the Court hereby DENIES Defendant Celanese's motion for summary judgment, in its entirety (D.E. 30, 31).  Plaintiff's Title VII and Section 1981 claims remain pending against Defendant in this action, and the Court (1) declines to limit

Plaintiff's claim for back pay; and (2) declines to dismiss Plaintiff's claim for emotional distress damages.

SIGNED and ORDERED this 18th day of November, 2008.

_____
Janis Graham Jack
United States District Judge